In the Matter of the DISCIPLINE
OF Keith A. TIDBALL, as an
Attorney of Law.

No. 17955.

Supreme Court of South Dakota.

Argued April 19, 1993.

Decided July 21, 1993.

R. James Zieser, Tyndall, for Disciplinary Bd.

Robert B. Frieberg of Frieberg, Rudolph and Peterson, Beresford, for respondent.

GILBERTSON, Circuit Judge.

## INTRODUCTION

This is a disciplinary proceeding against Respondent Tidball, a member of the State Bar of South Dakota. Respondent has admitted the factual allegations against him. As such, the facts will be set forth in an abbreviated manner.[1] There remains for this Court, the issue of a determination of the appropriate manner of discipline. The Disciplinary Board of the State Bar of South Dakota (Board) has recommended disbarment.

## FACTS

Respondent graduated from the University of South Dakota School of Law in 1966 and was admitted to the practice of law in

---

**1.** Respondent filed an affidavit with this Court and appeared at oral argument both personally and by counsel. He did not contest the amended findings of fact of the Board. Instead he attempted to explain why he acted in the manner in which he conducted himself. Thus, we adopt the findings of the Board. *Matter of Discipline of Dana* 415 N.W.2d 818, 822 (S.D. 1987), *Matter of Discipline of Bleeker,* 466 N.W.2d 858, 860 (S.D.1991) (Henderson, J., specially concurring.)

South Dakota on July 28, 1966. He has spent his entire professional career in the Pierre/Ft. Pierre area. He has engaged in a general private practice as a sole practitioner and in a partnership setting. At all times pertinent herein, he was practicing alone.

## 1. Trust Account Violations.

An audit by the Board established that between November 30, 1989 and December 15, 1992, Respondent did on numerous occasions commingle funds belonging to clients with his own personal funds. During this period Respondent had fallen on financial hard times and was being pressed by creditors. To avoid their garnishment attempts, he placed his personal funds in his trust account. He claims to have also kept client funds commingled along with his funds in bank drafts in his office safe to avoid his creditors. Deposits and withdrawals were made with such randomness that it is impossible to tell with exactness which transactions were of a personal nature and which involved a specific client. He failed to keep contemporaneous ledgers or other records which would allow him to render appropriate accountings to his clients upon request.

Several times, the balance in his trust account fell below what appears to be the amount of funds he held in trust for clients. His defense is that the remainder of the client funds were commingled with his personal funds in the bank drafts which were in his safe.[2]

## 2. The Glenda Hall Complaint.

In 1990 Respondent commenced representation of Hall in a divorce action. There never was a written fee agreement nor memorandum confirming any fee arrangement. The action was completed by settlement on May 16, 1991. Respondent drafted for his client's signature, an authorization to accept $10,000 as a settlement for her share of the marital assets. The authorization also stated that the legal fees were to be deducted from this amount. Hall signed it with the stipulation "legal fees not to exceed $1,000."

Upon receipt of the $10,000, Respondent withheld $2,500 for himself as fees for professional services. Hall complained that this was in excess of what she authorized to be deducted. Respondent claimed Hall owed him for past services and for representing her daughter and son at her request. It is clear that a dispute existed as to the amount of the fee.

## 3. The Patricia Marshall Complaint.

In September of 1989, Respondent agreed to represent Marshall on a wrongful death claim. They entered into a written contingent fee contract which entitled Respondent to a twenty-five percent fee of any recovery if there was no trial. The case was settled prior to trial.

In November of 1989, Respondent received $10,331.55 as a partial payment on medical bills and funeral expenses. In December of 1989, Respondent paid himself in lieu of fees $8,382.00 from the $10,331.55 received without the consent of the client or the court.

Additional funds were received in an amount of $62,372.91. Of this $40,000 never went into his trust account. Marshall made unsuccessful demands for all of her share of the settlement proceeds. Respondent admitted that he had commingled these funds with his own funds either in the trust account or through the use of the bank drafts in the safe. Marshall ultimately retained different counsel who also made repeated demands upon Respondent for payment. Finally after months of demands, the remaining amount due of $3,877.43 was delivered to Marshall.

Respondent now admits that he failed to promptly account for these funds and failed to keep proper records of trust account transactions concerning this matter.

---

**2.** This defense is rendered somewhat questionable by Respondent's admission that his real estate license was revoked by the South Dakota Real Estate Commission in April of 1991 for his using one client's money to pay another client's bills. Respondent did not contest the revocation proceedings.

*4. Failure to Respond to the Disciplinary Board.*

On June 18, 1991, the Board asked for a response to the Hall complaint within ten days.[3] No timely response was rendered. On July 9, 1992 the Board sent a second request for a response, *citing In re Rude,* 88 S.D. 416, 221 N.W.2d 43 (1974). A response was finally received on July 19, 1991.

On November 14, 1991 Respondent admitted service on a subpoena duces tecum which directed him to produce his trust account ledgers and bank records at the Board meeting on December 5th. Respondent appeared at that meeting but did not produce all the subpoenaed records. In large part this is because these client ledger sheets did not exist. Respondent agreed to make client ledgers and deliver them by December 12, 1992. This he failed to do. He was noticed to a second hearing before the Board on January 3, 1992 at which time he appeared and finally produced the subpoenaed records.

Respondent's conduct towards the Board in its attempt to investigate the Marshall complaint was largely the same. On August 14, 1992, the Board requested that he respond within ten days to the complaint. No response was received.

On October 29, 1992, the Board again requested a response citing sanctions for failure to do so pursuant to *In re Rude.* No timely response was forthcoming.

At the hearings Respondent attended, he blamed his lack of attention to his clients and the Board on health problems such as cancer treatment. However the real reason is that he had become a chronic abuser of alcohol. Respondent subsequently described his condition at that time as follows:

I was unresponsive to complaints directed to me by the Disciplinary Board and did not timely respond by way of explanation or by way of providing copies of my records. At the time I was only interested in continuing my drinking to avoid the reality and the hurt that was mine. I did not go to my office, refused new clients, did not pick up mail and generally failed to do anything except plan my life to provide opportunity for drinking.

His condition deteriorated to a point that concerned family, friends and attorneys convinced him to enter in-patient alcohol treatment in August of 1992. He successfully completed this program and has followed aftercare recommendations. It appears that he has not had a drink since being released from treatment.

On December 18, 1992 a hearing was held by the Board concerning the Marshall complaint. Counsel for Respondent appeared but Respondent did not and provided no specific explanation nor advance notice for his absence. His counsel reported having difficulty corresponding or dealing with him.

At oral argument before this Court on April 19, 1993, it was reported that Respondent has regained control of his life, and refrains from the use of alcohol. He wishes to retain his right to practice law only in the capacity of working for a corporation and does not intend again to engage in private practice.

## LEGAL ANALYSIS

*1. Trust Account Violations.*

Rule of Professional Conduct 1.15(a) governs the matters of the use and misuse of the trust account. It states in part:

A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated.... Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of

---

**3.** This was not respondent's first appearance before the Board. He received a private reprimand on June 21, 1988 and a second, for a trust account violation, on December 31, 1990.

five years after termination of the representation.

*See also* SDCL 16–18–20.1.

 Using client funds without the client's permission displays an unfitness to practice law and in no way can be excused by an attorney's negative cash flow. *Matter of Pier*, 472 N.W.2d 916, 917 (S.D.1991); *In re Rude, supra.*[4] The mere fact that the balance in an attorney's trust account has fallen below the total of amounts held in trust for clients supports a conclusion of misappropriation. This is a serious violation of an attorney's professional ethics which is likely to undermine the public's confidence in the legal profession. *Giovanazzi v. State Bar of California*, 28 Cal.3d 465, 169 Cal.Rptr. 581, 585–86, 619 P.2d 1005, 1009 (1980).

Respondent's defense is that the balance of the client funds were contained in the $24,500 in bank drafts in his safe written from a Jerry Hirsch to Jerry Hirsch. Respondent also states that he did this not to injure clients, but to protect his personal assets from his garnishment attempts.

Respondent's partial justification for his conduct is that he used the bank drafts to avoid garnishment of his client's funds by his personal creditors. This fear has no legal basis. SDCL 21–18–12 authorizes garnishment only where the garnishee has money in his possession "belonging to the defendant, or in which he shall be interested...."

Property and funds owned by, or due to, defendant as a trustee are not subject to garnishment for his individual debts.... A bare legal title in defendant is insuffi-

cient where the equitable or beneficial interest is in another.

38 C.J.S. *Garnishment,* § 81 (1943).

 An attorney who collects money for his client holds the same as a trustee and the circumstances under which he is liable are much the same as any other type of trustee. *Wangsness v. Berdahl,* 69 S.D. 586, 13 N.W.2d 293 (1944). *See also,* SDCL 16–18–20. In other words, there must be a legal basis for a recovery against the client, rather than the attorney, for the client's funds in the attorney's trust account to be subject to garnishment. *Egland v. Neill,* 75 S.D. 361, 65 N.W.2d 576, 577 (1954).[5]

 This type of trust account conduct is in clear violation of Rule 1.15. Such action was specifically condemned by the Iowa Supreme Court in *Committee on Professional Ethics v. Gross,* 326 N.W.2d 272 (Ia.1982). We also condemn it.

### 2. The Glenda Hall Complaint.

 The unilateral removal of the $2500 "fee" from the Hall divorce proceeds is governed by Rule 1.15(d)(2)(d): "A lawyer shall promptly pay or deliver to the client as requested by a client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive." It is also a violation of Rule 1.15(b) which states:

> Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and upon request by the client or third person, shall promptly render a full accounting regarding such property.

---

**4.** The fact that the attorney's monetary problems arise from financial decisions made outside his legal practice is of no defense or distinction in avoiding discipline from this Court. As we held in *Matter of Voorhees,* 294 N.W.2d 646, 648 (S.D.1980):

> Nor can it be suggested that the fact that Voorhees was acting in a purely commercial capacity rather than as a practicing attorney when he perpetrated the offense in any manner lessens the need for grave discipline, for

that would be the same as saying that if you cannot make a dishonest buck in the commercial world try the legal profession.

*See also Matter of Discipline of Dana, supra* at 823.

**5.** We do not imply this declares open season on client's trust account funds. The client still has the opportunity of raising any legal defenses he or she may have to the garnishment attempt.

Respondent maintains that Hall was not entitled to receive the $1500 in dispute as it was his fee. Such disputes are addressed by Rule 1.15(c) which requires: "if a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved." The Comments to Rule 1.15 are instructive in this type of a situation:

Lawyers often receive funds from third parties from which the lawyer's fee will be paid. If there is a risk that the client may divert the funds without paying the fee, the lawyer is not required to remit the portion from which the fee is to be paid. However, a lawyer may not hold funds to coerce a client into accepting the lawyer's contention. The disputed portion of the funds should be kept in trust and the lawyer should suggest means for prompt resolution of the dispute, such as arbitration. The undisputed portion of the funds shall be promptly distributed.

Respondent clearly did not follow this procedure but instead pocketed the $2500 when $1500 of it was in dispute.

### 3. The Patricia Marshall Complaint.

■ The commingling of the Marshall assets held in trust and Respondent's failure to promptly pay them over to Marshall despite repeated demands, stand as an additional violation of Rule 1.15(a), (b) and (d)(2)(d).

Such conduct may also be in violation of SDCL 16–18–23 which makes it a criminal offense for an attorney in possession of a client's property to refuse to pay or deliver it in a reasonable time after demand. In re Rude.

### 4. Failure to Respond to the Disciplinary Board.

■ The numerous failures to promptly reply to Board demands for responses and subpoenas are a violation of SDCL 16–19–54, 16–19–55 and 16–19–56 and are a separate basis for discipline. Matter of Discipline of Kirby, 336 N.W.2d 378, 380 (S.D. 1983). It is also the basis for increasing the severity of the appropriate discipline imposed for the commission of other acts

of unprofessional conduct. Matter of Discipline of Kintz, 315 N.W.2d 328, 331 (S.D. 1982). Today we reaffirm in the strongest possible terms the admonition given the bar in In re Rude:

The members of the Grievance Committee perform a difficult and all too often thankless task in investigating charges of professional misconduct against their brother lawyers. In this instance the members of the Committee gave respondent several opportunities to appear before the Committee and offer his explanation regarding the charges that had been made against him, opportunities that he spurned. We consider respondent's failure to respond to the communications from the Grievance Committee to be indicative of his attitude towards the serious nature of the complaints lodged by (his clients). Lest anyone consider that the consequences of failing to reply to the Grievance Committee are singularly visited upon the respondent, let this opinion be fair notice that similar inexcusable failures to respond will count heavily in any subsequent formal disciplinary proceedings brought against an attorney. He acts at his peril who treats a communication from the Grievance Committee with the indifference accorded an unsolicited invitation to join a book club. (citations omitted).

88 S.D. at 422–423, 221 N.W.2d at 47. Rude was disbarred with his indifference to the Grievance Committee (subsequently the Disciplinary Board) weighing "heavily against the plea that we exercise leniency in imposing discipline." Rude, 88 S.D. at 425, 221 N.W.2d at 49, supra.

### 5. Disciplinary Considerations.

■ The purpose of attorney disciplinary proceedings is not to punish the attorney but to remove from the profession those whose misconduct has proved them unfit to be entrusted with duties and responsibilities belonging to the office of an attorney so that the public may be protected from further wrongdoing. Matter of Walker, 254 N.W.2d 452, 455 (S.D.1977). Appropriate discipline is determined upon a

consideration of the seriousness of the misconduct by the attorney and the likelihood of repeated instances of similar misconduct. *Kirby, supra,* at 380.

We are not unmindful of the insidious effect of alcohol abuse which plague some brothers and sisters of the bar as well as an unfortunately large segment of the public.[6] We support treatment efforts to return individuals to productive lives. *Matter of Walker, supra,* at 455; *Matter of Weisensee,* 296 N.W.2d 717, 722 (S.D.1980).

Nevertheless the standard which governs our deliberations is clear. We are not to balance the potential for rehabilitation against protection of the public. Our duty to protect the public is paramount and encouragement for rehabilitation must be done within that context. *Rude, supra,* 221 N.W.2d at 48. Alcoholism per se is no defense. *Walker, supra,* at 457. The client suffers as much through the misconduct of the alcoholic attorney as if the same misconduct had as its source a calculated evil motive. *Matter of Kintz, supra.* To hold otherwise would wreak havoc with the process of disciplinary proceedings for all too frequently misconduct by attorneys appears to be attributable at least in part to the factor of alcoholism. *Walker, supra,* at 455.

The scope of our consideration is broader than the current status of the Respondent. The fact that he has effectively removed himself from private practice may protect his would be clients, but all attorneys in this state are subject to these rules and all citizens of this state desire and deserve the protection afforded by the rules. *Matter of Discipline of Bergren,* 455 N.W.2d 856, 857 (S.D.1990). "[A]n application of common sense would show that the discipline for attorney misconduct also

serves to deter similar conduct in the profession which, in turn, fosters and maintains the ethics of the legal profession." *Matter of the Discipline of Dana,* 415 N.W.2d 818, 823 (S.D.1987). "The foundation of an attorney's relationship with clients and the legal system is trust." *Pier, supra,* at 917. Public confidence that the legal profession, under the supervision of this Court, can keep its affairs in order must be zealously maintained. *In re Kunkle,* 88 S.D. 269, 218 .N.W.2d 521, 527 (1974), *Walker, supra; Weisensee,* 296 N.W.2d at 722. In an age where the legal profession is under heavy attack a "slap on the wrist ... would not lend credibility to the high ethical standards of the profession." *Weisensee,* 296 N.W.2d at 722–723 *citing Matter of Voorhees, supra.*

We have heard repeated pleas for leniency in the past based on alcohol abuse and probably will hear more in the future. Respondent points to *Walker, supra,* and requests a similar discipline. The sanction against Walker was suspended upon the fulfillment of certain conditions. Walker had maintained sobriety for a period of two and one half years prior to this Court's decision. In this case, Respondent did not seek help until the eleventh hour, nearly two months after the Board initially recommended his disbarment. Even at the subsequent hearing in December 1992 on the Marshall matter, he did not attend nor give the Board any reason for this failure and was barely cooperating with his own counsel. *Walker* is quite explicit on the reason leniency was granted:

[I]t should be made clear to all that our disposition in this case does not signal the advent of a new defense in disciplinary proceedings. We do not hold that alcoholism as a causation factor in mis-

---

6. An affidavit filed in Respondent's behalf by an attorney who had been led back to a productive personal and professional life through the program of Alcoholics Anonymous describes the effect alcohol abuse can have on an attorney:
 That failure to timely respond to clients or the Disciplinary Board results from a condition that I call "paralysis" of the mind.
 That it is my opinion that this "paralysis" of the mind is prompted by an alcoholic's inability to respond professionally and rationally to the demands of law practice while drinking and under the influence of alcohol.
 That it is my opinion that upon achieving sobriety and engaging in a course of treatment and conduct designed to maintain sobriety, the "paralysis" will no longer control the person's ability to deal with others.

conduct will shield the perpetrator from the consequences of his actions. The respondent did not receive the consideration that we have given him because he is an admitted alcoholic but rather because he is, in our view, a bona fide recovered or arrested alcoholic who has for the past two and one-half years demonstrated his fitness to continue in the practice of law.[7]

254 N.W.2d at 457.

 As has been noted, the Board recommended disbarment. We are not bound by this recommendation but do give it our careful consideration. *Petition of Draeger*, 463 N.W.2d 346, 347 (S.D.1990). Respondent has not contested that he is subject to discipline pursuant to SDCL 16–19–33 for his violations of the Rules of Professional Conduct and statutes covering the authority and duties of the Board.

*6. Discipline Imposed Upon Respondent.*

 Our options concerning discipline are set forth in SDCL 16–19–35. They are public censure, placement on probationary status, suspension for up to three years and disbarment. It is our determination that Respondent be suspended from the practice of law for a period of three years. We feel that this adequately protects the public while allowing Respondent to establish a period of sobriety to prove to this Court that he is once again fit to be allowed the privilege of practicing law in South Dakota. While his age of 59 may make re-entry into the legal profession more difficult, it is not impossible and many of our members of the bar continue to actively practice law well after their 62nd birthday.

The three remaining active files in his practice are to be referred to other attorneys and full compliance is ordered with the requirements of SDCL 16–19–78 to 80.

Respondent shall return the $1500 to Glenda Hall.

Respondent must pay interest to Marshall at the legal rate for funds wrongfully withheld for more than a period of fourteen days.

Judgment is rendered against Respondent for all necessary costs as shall be taxable by the clerk as set forth in SDCL 16–19–70.

Respondent may file a petition for reinstatement with the Board pursuant to SDCL 16–19–84 at the conclusion of the three year period of suspension. He is to demonstrate that he has maintained sobriety during the period of suspension and has fully complied with the requirements of this opinion and applicable statutes.

WUEST, Acting C.J., and STEELE, Circuit Judge, concur.

HENDERSON and AMUNDSON, JJ., dissent.

GILBERTSON, Circuit Judge, for MILLER, C.J., disqualified.

STEELE, Circuit Judge, for SABERS, J., disqualified.

HENDERSON, Justice (dissenting).

We first consider SDCL 16–19–31, which provides, inter alia:

> The license to practice law in this state is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court.

Considering this admonition, it is our duty to disbar Tidball. It is noted that Tidball's conduct has been a serious violation of professional ethics, which would cause the maintenance of respect for the courts and

---

7. We held in Matter of *Discipline of Stanton*, 446 N.W.2d 33, 37 (S.D.1989) that an attorney who is physically unable to promptly attend to his client's business has an obligation to refer the client's matter to another attorney. The same rule applies to those attorneys disabled by alcohol abuse. We recognize the nature of the dis-

ability may present difficulties for the alcoholic attorney to attend to this requirement. Nevertheless the protection of the client mandates this standard be applied in alcohol abuse disabilities the same as in other disabilities. The client's pressing legal needs cannot be left in a legal limbo.

judges, and the respectability of the legal profession, to greatly suffer. *Matter of Walker*, 254 N.W.2d 452, 455 (S.D.1977); *In re Kunkel*, 88 S.D. 269, 218 N.W.2d 521 (1974), *cert. denied*, 419 U.S. 1036, 95 S.Ct. 521, 42 L.Ed.2d 312 (1974). As detailed below, not only has the legal profession suffered, his clients have also suffered.

Tidball has admitted to using his clients' funds without permission. This conduct began November 30, 1989, and ended in the middle of December, 1992. He commingled his clients' funds with his own funds in violation of Rule of Professional Conduct 1.15(a). According to Tidball, he kept a sizeable amount of his clients' money in a vault in his office to avoid his personal creditors from garnishee proceedings on a trust account. Therefore, he established no trust account to avoid garnishment. We strongly disapproved of ethical misconduct in *Matter of Pier*, 472 N.W.2d 916, 917 (S.D.1991) and disbarred Pier. Like Pier, Tidball used his clients' funds. Tidball's misuse of his clients' funds was a serious ethical breach.

An admission has been made by Tidball that he did not promptly remit funds of his client, one Glenda Hall, unto her whereupon she filed a complaint with the South Dakota State Bar. This constitutes a violation of 1.15(d)(2)(d) of the Rules of Professional Conduct.

Hall filed a complaint against Tidball for mishandling and wrongfully appropriating to his own use certain settlement funds in a divorce action. A dispute arose over Tidball's attorney fee. Tidball took $2,500.00 as his fee out of a $10,000.00 partial settlement she received in the case, without her permission. She maintained she authorized a sum which was not to exceed $1,000.00. Knowing a dispute existed, he failed to separate the disputed amount in a separate account. He had no writing with Hall concerning his fee and he commingled his money with her money. Repeated demands for money held in trust for Hall produced no positive response by Tidball. Rule 1.15(c) provides: "... if a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

Patricia Marshall, another client of Tidball's, also complained of his professional misconduct in representing her in a wrongful death case. A contingent fee contract was drawn whereby Tidball was entitled to twenty-five percent of the recovery if no trial ensued. No trial ensued. We should adopt these findings of the Disciplinary Board:

## XXIV.

The Board finds as fact that the Respondent during December 1989 paid himself in lieu of fees $8,382.00 from the sum of $10,331.55 received, without consent of either the client or the court which sum was not earned nor due.

## XXV.

The Board finds as fact that the Respondent failed to properly pay to his client the trust funds received on behalf of his client although requested to do so numerous times by the client and the client's new attorney as early as February 19, 1992 through December 15, 1992.

## XXVI.

The Board finds as fact that the records kept by the Respondent of funds received on behalf of his client, Patsy Marshall, were woefully inadequate.

## XXVII.

The Board finds as fact that the Respondent has now paid Patsy Marshall the funds due her but not the interest thereon for late payment.

Tidball's conduct, as reflected above, adversely reflects upon his integrity, competency, and fitness to practice law. *In re Parker*, 269 N.W.2d 779, 780 (S.D.1978).

Lastly, we should examine Tidball's attitude towards the complaints made against him and his failure to respond to the Disciplinary Board. The record reflects that Tidball repeatedly failed to respond to the lawful demands of said Board. Further-

more, and additionally, process was served upon him by his admission of service, to produce client ledgers and provide records. These particular demands were initiated by the Board on November 14, 1991. After repeated notices to comply with the Subpoena Duces Tecum, finally in January, 1992, Tidball responded. This conduct was indifference at best. We have repeatedly denounced such non-action. It is a violation of Rule 8.1(b) and prior Supreme Court pronouncements. *In re Rude*, 88 S.D. 416, 221 N.W.2d 43 (1974). It constitutes grounds for disbarment in this state. We cannot tolerate nor condone a lawyer who has complaints filed against him to disregard a lawful demand to answer the complaints. Were we to do so, the entire ethical machinery of the legal profession would disintegrate. Such type of conduct, if excused, would cripple the legal profession in its duty to police the profession and protect the public. *See Discipline of Kirby*, 336 N.W.2d 378, 380 (S.D.1983).

Tidball's alcoholism is a mitigating factor but is not a defense to his many ethical breaches. *Walker*, 254 N.W.2d at 457. Only after it was apparent that Tidball would suffer severe sanctions, did he turn himself into Ft. Meade, South Dakota, as an alcoholic. His rectification and remorse came at the eleventh hour. To use his clients' money, to lock his clients' money up in a safe to avoid his own creditors, to fail to have a trust account, to commingle his funds with those of his clients, to wrongfully appropriate money within a settlement is activity disrespecting the office of an Attorney At Law. And this profession, above and beyond that rebuke, owes a greater duty to protect the public in the future from such wrongdoing. *Walker* at 455. *Matter of Discipline of Bergren*, 455 N.W.2d 856, 857 (S.D.1990).

AMUNDSON, Justice (dissenting).

This attorney stipulated that his conduct in handling his trust account, client's settlement proceeds, and responding to the correspondence and requests for production from the disciplinary board fell below that required by the Code of Professional Responsibility. Based on these undisputed facts, Tidball should be disciplined.

This record also brings to light another attorney who was operating with an impotent, deadened, crippled, and disabled mind during the periods in question. Again it is obvious that these conditions were caused in part, if not totally, by the destructive disease known as alcoholism. I totally acknowledge that this disease is not a defense to an attorney's misconduct, but can only be considered as a mitigating factor when meting out an appropriate discipline. *In re Walker*, 254 N.W.2d 452 (S.D.1977).

The fact that Tidball did not seek treatment until the eleventh hour should not be a determinative factor in this case. There can be no set rule as to when a person suffering from alcoholism will realize they have hit the bottom of the barrel. The important fact to consider is that a person has finally realized that he/she has a problem and sought help. The affidavit submitted by an active member of Lawyers Concerned for Lawyers, an adjunct organization of the State Bar, states that Tidball has been sober for eight months, which is a length of sobriety never attained by a majority of alcoholics. This is probably due to the fact that alcoholism, due to its nature, is characterized by a high rate of recidivism.

There does not appear to be any dispute of the fact that in this case there was a causal relation between how this disease affected Tidball and its contribution to his misconduct. The major difference in this case and other discipline cases is that a member of the public, United Sioux Tribes of South Dakota Development Corporation, has come forward and requested that Tidball be allowed to continue to represent it as its in-house counsel. This request has been made notwithstanding this entity's full knowledge of Tidball's past misconduct. This organization has represented to this court that it needs Tidball's services, his experience in handling the work is irreplaceable, the firm has confidence in Tidball's ability, and Tidball has expertise in Indian affairs. Finally, it represents that Tidball "has always been there to help the

poor and poverty stricken without great concern for compensation." This could explain a part of Tidball's financial problems as evidenced in this record.

This court has recognized on a number of occasions in the past that

the purpose of disciplinary proceedings is not to punish but to remove from the profession those attorneys whose misconduct has proved them unfit to be entrusted with duties and responsibilities belonging to the office of an attorney so that the public may be protected from further wrongdoing. Disbarment is warranted when it is clear that the protection of society requires such action or where the maintenance of respect for courts and judges or the respectability of the legal profession itself demands such action.

*Walker*, 254 N.W.2d at 455 (citations omitted).

Also, in determining an appropriate discipline, this court has held:

We must keep in mind that the real and vital issue to be determined in disbarment proceedings is whether or not the accused, from the whole of the evidence submitted, is a fit and proper person to be permitted to continue in the practice of law.

*In re Weisensee*, 88 S.D. 544, 546, 224 N.W.2d 830, 831 (1975).

It goes without saying that alcoholism is not a defense but can only be considered as a mitigating factor. *Walker, supra.* Further, this court has acknowledged in the past that rehabilitation is appropriate for consideration in this type of proceeding.

We are not unmindful that this is a case of first impression in the area of attorney discipline in this state and we sincerely hope that it will serve as an incentive to this respondent *to continue his efforts at rehabilitation* and as an adequate measure to protect the public against a recurrence of the harm which was caused by his delinquencies.

*Walker*, 254 N.W.2d at 457 (emphasis supplied).

As this case comes before this court, I cannot agree that the appropriate discipline is to place this fifty-nine-year-old attorney out to pasture for three years or, in essence, end his legal career. On the other hand, if the record was such that no efforts had been made to overcome his bondage to booze, I would not hesitate to vote for a more severe punishment. Therefore, in this case, it is not clear that an unconditional three-year suspension is required or needed.

*In re Discipline of Bleeker*, 466 N.W.2d 858 (S.D.1991), this court issued a six-month suspension where the referee found the attorney failed to keep proper records of estate assets, commingled client funds with his own, failed to keep clients' funds safe and separate, and was guilty of constructive fraud.

Also, the Board in this case relies on the case of *Giovanazzi v. State Bar of California*, 619 P.2d 1005 (Cal.1980), for the fact that mishandling of a trust account constitutes a serious breach of the Code of Professional Ethics. This court has so found in the majority holding. A further review of *Giovanazzi* brings to light that the appropriate discipline for such serious conduct was an actual thirty-day suspension. *Id.* 169 Cal.Rptr. at 586–87, 619 P.2d at 1010.

When dealing with cases involving the disease of alcoholism, this court should fashion discipline to accomplish the following objectives: (1) protect the public; (2) encourage rehabilitation; and (3) fashion the discipline to protect all concerned when dealing with this most difficult disease, but yet not lose sight of a public perception that the matter was merely swept under the rug or white-washed. In attempting to attain these laudable goals, I would impose the following discipline in this case:

That Tidball be suspended for three years, with all but ninety days of the suspension held in abeyance on the following conditions:

(1) He shall only be authorized to perform legal work for United Sioux Tribes of South Dakota Development Corporation as its full-time employee after the ninety-day suspension has expired.

(2) He shall not reopen his office for the general practice of law for the full

term of his suspension and shall be required to follow the procedures of SDCL 16–19–84 to SDCL 16–19–86 after three years from the effective date of this decision before going back into the general practice.

(3) He shall refrain from the use of alcoholic beverages or controlled substances at all times.

(4) He shall continue with his program of rehabilitation which includes, but is not limited to, attendance at AA meetings.

(5) He shall refer his three remaining active files to other attorneys.

(6) He shall refund $1,500.00 to Glenda Hall.

(7) He shall pay the costs of this proceeding within six months from the date of the decision.

By allowing this limited right to be employed and earn a living, this attorney in the twilight of his career will be allowed to provide for his family, pay his debts, continue on with his rehabilitation, and at the same time the public has been protected. This proposed discipline would be difficult to construe as merely sweeping under the rug or white-washing this attorney's misdeeds.